# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 07-74-B-H-16 |
| | ) | |
| LISA DELAURENTIIS, | ) | |
| | ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR BILL OF PARTICULARS AND MOTION TO SUPPRESS

### I. MOTION FOR BILL OF PARTICULARS

The motion for bill of particulars on the conspiracy charge is **DENIED**.  Chief Judge Woodcock of this District has recently set out the factors for considering such a motion, and I see no need to rework them:

> Eclipsed by Rule 16 discovery requirements, motions for bills of particulars are seldom employed in modern federal practice. When bills of particulars are pursued, they need only be granted if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause.  Whether to grant a motion for a bill of particulars is left to the sound discretion of the district judge, whose decision will be reversed only for abuse of discretion. In exercising its discretion, the trial court will often consider whether the defendant has demonstrated "actual prejudice" from the indictment's lack of specificity; namely, specific evidence or witnesses that the lack of particularization prevented him from obtaining.  An indictment that specifies the law that the defendant allegedly violated and provides a temporal framework in which certain conduct is alleged to have occurred is sufficient; "open-file" discovery may obviate the need for greater specificity.

<u>United States v. Poulin</u>, 588 F. Supp. 2d 64, 67 (D. Me. 2008) (internal quotations and citations omitted); <u>see also</u> <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1192-93 (1st Cir. 1993); <u>United States v. Hallock</u>, 941 F.2d 36, 39-41 (1st Cir. 1991). Here, DeLaurentiis fails to show "actual prejudice."  The second superseding indictment specifies the law that DeLaurentiis allegedly violated (conspiracy to possess with the intent to distribute five kilograms or more of cocaine, fifty grams or more of cocaine base, and oxycodone), and provides a "temporal framework" in which the conduct allegedly occurred (between January 1, 2002 and June 1, 2005).  It also lists the names of several alleged co-conspirators.  The second superseding indictment is therefore sufficiently detailed.  DeLaurentiis concedes that she has been given "massive discovery," although she claims that most of it does not pertain to her.  Def.'s Reply in Support of Mot. for Bill of Particulars at 2 (Docket Item 630).  But she will not be "disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause."  See <u>Sepulveda</u>, 15 F.3d at 1192-93.

## II.  MOTION TO SUPPRESS

The issues on the motion to suppress are whether DeLaurentiis unambiguously invoked her right to counsel such that DEA questioning should have stopped and whether her statements to the agents were voluntary.  I held an evidentiary hearing on May 29, 2009. Thereafter, the lawyers filed additional legal memoranda.  I now **GRANT** the motion to suppress the statements that she made

during interrogation because the agents denied DeLaurentiis's unequivocal request for counsel and because her statements were involuntary.

Miranda v. Arizona, 384 U.S. 436, 469-73 (1966), held that a suspect undergoing custodial interrogation has the right to consult a lawyer and to have a lawyer present during questioning, and that law enforcement agents must explain this right to the suspect before questioning begins.  If a suspect effectively waives this right to counsel after receiving the Miranda warnings, law enforcement agents may question the suspect until the suspect requests counsel.  Then, interrogation must end until a lawyer has been made available to the suspect, or the suspect herself reinitiates discussion.  Edwards v. Arizona, 451 U.S. 477, 483-85 (1981).[1]

---

[1] The United States Supreme Court very recently recapitulated these requirements in the somewhat different context of questioning after arraignment:

> Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. And when a defendant is read his Miranda rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the Miranda rights purportedly have their source in the *Fifth* Amendment[.]
> . . . .
> Edwards v. Arizona decided that once "an accused has invoked his right to have counsel present during custodial interrogation . . . [he] is not subject to further interrogation by the authorities until counsel has been made available," unless he initiates the contact.
> The Edwards rule is designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights. It does this by presuming his postassertion statements to be involuntary, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.

Montejo v. Louisiana, ___ U.S. ___, 2009 WL 1443049, at *6 (U.S. May 26, 2009) (internal quotations and citations omitted). Further:

> Under the Miranda- Edwards- Minnick line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first

*(continued on next page)*

According to <u>Davis v. United States</u>, 512 U.S. 452 (1994), a suspect must articulate this invocation of the right to counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  If the statement fails to meet the requisite level of clarity, <u>Edwards</u> does not require the officers stop questioning the suspect." <u>Davis</u>, 512 U.S. at 459-61.

Here, DEA agents arrested DeLaurentiis as she got out of her car at her residence in Juno Beach, Florida around 6 p.m.  Tr. of Testimony of Lisa DeLaurentiis at Suppression Hr'g 5:20-21, May 29, 2009 (Docket Item 657); Aff. of Steven Sicard ¶ 3 (Gov't Ex. 1).  There is some disagreement about what happened next at the residence, such as who suggested that a neighbor could care for her twelve pets, whether the neighbor was already at his door or had to be summoned

---

approached and given the <u>Miranda</u> warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. . . .

It is true . . . that the doctrine established by <u>Miranda</u> and <u>Edwards</u> is designed to protect Fifth Amendment, not Sixth Amendment, rights. But that is irrelevant. What matters is that these cases, like <u>Jackson</u>, protect the right to have counsel during custodial interrogation-which right happens to be guaranteed (once the adversary judicial process has begun) by two sources of law. Since the right under both sources is waived using the same procedure, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver.

<u>Id</u>. at *11 (internal citations omitted). Finally:

If [a defendant] made a clear assertion of the right to counsel when the officers approached him about accompanying them on the excursion for the murder weapon, then no interrogation should have taken place unless [the defendant] initiated it. Even if [the defendant] subsequently agreed to waive his rights, that waiver would have been invalid had it followed an "unequivocal election of the right."

<u>Id</u>. at *13 (internal citation omitted) (quoting <u>Texas v. Cobb</u>, 532 U.S. 162, 176 (2001) (Kennedy, J., concurring)).

4

by knocking, whether at arrest she had to place her hands on her car, and how it came about that agents removed her handcuffs while she cared for her pets. But the only material issue is what happened *after* DeLaurentiis was permitted to arrange for her pets' care and as agents were placing her in the DEA car to take her to the DEA office for questioning. Her neighbor testified by affidavit that it was then that DeLaurentiis asked him to "call her mother and have her uncle, *whom she stated specifically was a lawyer,* meet her." Aff. of Chris Gannett ¶ 5 (Def. Ex. 5) (emphasis added); Supplemental Aff. of Chris Gannett ¶¶ 2, 4 (Def. Ex. 6).[2] That statement is consistent with DeLaurentiis's testimony at the suppression hearing, where she testified: "I asked [Mr. Gannett] to call my mother to have her call my uncle, who is her brother, who I explained is an attorney, and to get him to meet me downtown because I needed help." DeLaurentiis Suppression Hr'g Tr. 13:8-12. Although the agents testified that they heard no such utterance and that DeLaurentiis's only reference to her uncle was earlier, as a possible caretaker for the pets, I find, in light of the neighbor's affidavit, that DeLaurentiis made the utterance as described and that the agents could hear her, since they were nearer to her than her neighbor. Nevertheless, DeLaurentiis's utterance at that time was not, alone, an unambiguous assertion of her right to counsel in connection with any questioning. See Davis, 512 U.S. at 459-61; Obershaw v. Lanman, 453 F.3d 56, 64 (1st Cir. 2006) (quoting Davis's "reasonable police officer" language and

---

[2] The defendant offered to make the neighbor available for government cross-examination by video-conference in light of his location in Florida. The government did not accept the offer, and agreed to the admission of the neighbor's affidavit. See Gov't Resp. to Def.'s Mot. to Admit Affs. (Docket Item 618).

concluding that "[t]he test is an objective one"). It was not directed to the agents and nothing about it suggested that it was directed to questioning (as distinguished, for example, from assistance in posting bail). See Davis, 512 U.S. at 459-61; Sanna v. DiPaolo, 265 F.3d 1, 10 (1st Cir. 2001) (stating that "[a]t a bare minimum, an invocation of the right to counsel must be communicated by the suspect to the police"); accord Nom v. Spencer, 337 F.3d 112, 118 (1st Cir. 2003) (distinguishing a suspect's request for an attorney's presence only for the purpose of witnessing a gunshot residue test, from an invocation of the right to counsel during interrogation).

At her residence and on the ride to the DEA office, DeLaurentiis made no statements that the government intends to use against her.  It is undisputed that the agents administered Miranda warnings to DeLaurentiis upon arrival at the DEA office.  But there are two flatly opposite versions of what happened thereafter, the time period of the incriminating statements that are the object of the motion to suppress.

DeLaurentiis testified that when agents told her at the DEA office that she could have a lawyer, "I said that I would like to phone my mother now to have her call my uncle, who is an attorney, and see if he can come down here." DeLaurentiis Suppression Hr'g Tr. 15:10-12.  Under the caselaw, that statement alone is probably ambiguous as it relates to assertion of the right to counsel.  See Davis, 512 U.S. at 462 (affirming the lower court's finding that the defendant's statement "Maybe I should talk to a lawyer" was not a sufficiently clear request for counsel); Obershaw, 453 F.3d at 64-65 (noting that by asking "Can I talk to a

6

lawyer first?" the defendant "inquired whether he could talk to a lawyer, rather than expressly asserting that he in fact wanted to do so"); <u>United States v. Wheeler</u>, 84 F. App'x 304, 306 (4th Cir. 2003) (finding that the defendant's statement that he "wanted to call his family to see about a lawyer" was "not a clear, unambiguous request for counsel"); <u>Flamer v. Delaware</u>, 68 F.3d 710, 725 (3d Cir. 1995) (finding that the defendant's request to call his mother "to inquire about . . . possible representation" failed to meet <u>Davis</u>'s requisite clarity). She also testified that "One time during our conversation I made a statement, I said, I don't understand what's taking my uncle so long, why isn't he here yet."[3] DeLaurentiis Suppression Hr'g Tr. 16:3-5. The only request that DeLaurentiis could believe had even reached her uncle at that point was the request to her neighbor to phone her mother to phone her uncle, a request that I have ruled is ambiguous so far as asserting a right to counsel at questioning is concerned. This additional statement by DeLaurentiis at the DEA office would not, alone, cure that ambiguity.

But DeLaurentiis also testified that she asked at least four times for her uncle the lawyer. In response to the question, "Did the officers say anything to you that made it clear that they knew you were asking for a lawyer?", DeLaurentiis testified:

> [T]he agent said, you do not want your attorney here. . . . They told me that if I asked for an attorney the conversation would be over and that I would go to the jail and I would be remanded there until trial. But if I cooperated with them and

---

[3] DeLaurentiis's uncle was unable to find his niece because she was not taken to court or, at that point, to any official custody location.

> didn't ask for my attorney, that if I told them everything I
> already know—that they already know, they would tell the
> prosecutor that I was cooperative and tell her to tell the—the
> judge to get me on bail.

Id. 16:5-16.  And later,

> After the first time I asked if I could get ahold of my mother
> again.  We had a short conversation, and then I asked if I
> could call my uncle.  And they said I couldn't call my attorney,
> they said that, again, if I asked for an attorney they would tell
> the judge I was uncooperative, that I was being charged with a
> conspiracy that held a ten-year-to-life sentence, and that if I
> was cooperative, even though they couldn't guarantee that I
> wouldn't do any jail time, that I would probably do less than
> what the sentence was.

Id. 16:22-17:6.  The government argues that this DeLaurentiis account of her

interrogation is wholly incredible.  Gov't Post-Hr'g Supplemental Arg. on Def.'s

Mot. to Suppress at 2 (Docket Item 634).  In doing so, the government does not

contend that DeLaurentiis's references to a lawyer or to her uncle were

ambiguous.  Instead, the agents deny outright that during the interrogation (or at

her residence) DeLaurentiis ever said anything even resembling reference to a

lawyer and maintain that she never asked to speak with *anyone*.  See Sicard Aff.

¶ 12; Aff. of Frederick Luce ¶ 7 (Gov't Ex. 2).[4]  I must determine, therefore, which

version is accurate.

The interview at the DEA office lasted between forty-five minutes and an

hour.  The agents then took DeLaurentiis to the local jail around 8 p.m. for

booking and overnight custody before she could see a federal judicial officer in the

morning.  The testifying agent did not know what happened after she was taken to

---

[4] The agent who testified also said that he did not know that her uncle was a lawyer.

the jail, did not know if she then called a lawyer, and did not know if the jail had voice recording policies. Apparently, DeLaurentiis and her current lawyer here in Maine also did not know about recording policies until a couple of days before the suppression hearing. But then they discovered that the jail does record all phone calls. As a result, the defense introduced at the suppression hearing a CD of a jail-recorded phone call from DeLaurentiis to her uncle starting at 8:01 p.m. on the night of her arrest, CD of Conversation between DeLaurentiis and Stephen Radford (Def. Ex. 4), a recording of which the prosecutor and testifying agent were previously unaware.[5] I have listened to that CD many times. It is apparent that DeLaurentiis is very emotional at the beginning of, and at other times during, the phone call. I find that under the circumstances she had no reason to lie to her uncle at that stage or to create a false scenario, that at least her earliest statements on the phone call were uncoached, and that these statements made to her uncle in such close proximity to the DEA questioning persuasively confirm her version of the interrogation.[6]

As the CD recording opens, DeLaurentiis's uncle calls her by name (Lisa) and tells her "Hey, don't talk to anybody, okay?" DeLaurentiis responds, "But I

---

[5] I granted a recess during the suppression hearing so that the government could listen to the CD before it was admitted.

[6] In its reply memorandum, the government asks me to find that DeLaurentiis's statements during the recorded phone call are not believable because of her emotional state at the time of the recording following the interrogation. Gov't Post-Hr'g Supplemental Arg. on Def.'s Mot. to Suppress at 2 (Docket Item 634). I reject the argument. I see no reason to conclude that her emotional state would lead her to mischaracterize what happened at the interrogation. I also do not find that the emotional jailhouse phone call immediately after interrogation was merely a crafty attempt to reinvent what happened at the interrogation, thereby laying a foundation for later suppression. She is not an experienced user of the criminal justice system (one Ohio DUI over ten years ago). See Tr. of Testimony of Lisa DeLaurentiis at Suppression Hr'g 30:22-32:4, May 29, *(continued on next page)*

already talked to the DEA agent." Her uncle immediately says, "Well, don't say another word," and she responds, "I asked them if I could talk to you when they first brought me in the room. I said that I want to call my Uncle Steve who is an attorney, and they wouldn't let me do it." Id. That was an emotional, unsolicited, utterance given to a trusted relative immediately after the interrogation, at a time when there is no reason to think that DeLaurentiis understood its significance or that she was being recorded.[7] She then responds "yes" to her uncle's questions whether the agents told her that she was under arrest and that she had the right to an attorney. Next, she tells her uncle on the phone call that she told the agents, "'I want to call my Uncle Steve' and they said 'No you'll be better just to talk to us. You just sit and talk to us.'"[8] Id. She also tells her uncle during the phone call that the agents told her (consistent with her suppression hearing testimony) that they would recommend that she be released the next day on personal recognizance, and even some of the factors that would bear upon the pretrial release decision. She also says, "I wasn't telling them anything. They kept telling me 'we already know, you need to tell us, we already know because we already know and if you don't tell us, then we're going to tell the judge you're not cooperating.'" Id.

---

2009 (Docket Item 657).

[7] Later, toward the end of the phone conversation, the lawyer/uncle states that he is unsure if the conversation is being recorded.

[8] During the conversation, DeLaurentiis's uncle reveals that he does not practice criminal law; but there is no evidence that DeLaurentiis or the agents knew of this limitation during the interrogation. See also supra note 5.

All of these contemporaneous statements, previously unknown to the government, are consistent with DeLaurentiis's, not the agents', testimony of what occurred at the interrogation.[9]  Finally, DeLaurentiis gave the Federal Defender's office consistent information the very next day.  Aff. of Dave Lee Brannon, Fed. Pub. Defender for the S.D. Fla. ¶ 5 (Def. Ex. 2) (stating "I understood from the defendant . . . that she had attempted to secure the assistance of a relative who is

---

[9] As should be apparent, the existence of the contemporaneous recorded phone call has a major effect on the outcome of this motion. Without it, I would have been inclined to disbelieve DeLaurentiis's version of the interrogation.

Apparently there is a separate, somewhat contemporaneous, version which I have not seen. DeLaurentiis's uncle advised her to write down at the jail all that had happened during the interrogation. CD of Conversation between DeLaurentiis and Stephen Radford (Def. Ex. 4). DeLaurentiis testified at the suppression hearing that the jail would not give her paper and that she wrote down her version on three pieces of paper when she returned home two days later, on Friday, and that her current lawyer has those pieces of paper.  DeLaurentiis Suppression Hr'g Tr. 25:21-27:14.  The prosecutor then moved for production under Federal Rule of Criminal Procedure 26.2, but DeLaurentiis's lawyer objected to "producing any communications between Ms. DeLaurentiis and me," citing attorney-client privilege. Id. 26:15-24. The prosecutor then read aloud the text of Rule 26.2, and upon realizing that it applies only to "a witness other than a defendant," he withdrew his request. Id. 27:3-6.

Even though Rule 26.2 does not require production of the notes, arguably the prosecutor could have questioned DeLaurentiis further about what she wrote down. Given her uncle's uncertain status, it is not clear to me that the notes are protected by attorney-client privilege. Even if they are so protected and she refused to divulge their content, arguably the prosecution could have asked me to draw an adverse inference as to what they contained. Under Federal Rule of Evidence 501, federal common law governs, and there are cases supporting an adverse inference. See Caminetti v. United States, 242 U.S. 470, 494 (1917) ("[W]here the accused takes the stand in his own behalf and voluntarily testifies for himself . . . . , [he] ought not to be heard to speak alone of those things deemed to be for his interest, and be silent where he or his counsel regarded it for his interest to remain so, without the fair inference which would naturally spring from his speaking only of those things which would exculpate him and refraining to speak upon matters within his knowledge which might incriminate him."); Lesko v. Lehman, 925 F.2d 1527,1542 (3d Cir. 1991) ("[I]t is permissible for the prosecutor or the court to advise the jury that it may draw an adverse inference from the defendant's silence when the defendant has testified as to some facts concerning the crime charged, but has refused to testify as to facts within his knowledge."); McCormick on Evidence § 74.1 (6th ed. 2006) (discussing the permissibility of drawing negative inference when "a party himself suppresses evidence by invoking a privilege given to him by the law"). But the prosecutor withdrew his request for the notes and did not inquire what is in them. Therefore, no such arguments have been presented to me, and I do not know whether the defendant would have persisted in the privilege claim in the face of a negative inference argument.

an attorney in order to decide whether to answer questions, but had been denied

that assistance").[10]

     In light of all the evidence presented at the suppression hearing, I find that

a reasonable officer would have understood DeLaurentiis to have made a clear,

unequivocal request for counsel at questioning (<u>Davis</u>'s "requisite level of clarity")

given her repeated requests and the agents' responses, and that the DEA agents

instead actively dissuaded her from contacting a lawyer.[11]  I also find that the DEA

---

[10] In its reply memorandum, the government essentially asks me to find that this lawyer committed perjury in signing the affidavit.  Gov't's Post-Hr'g Supplemental Arg. on Def.'s Mot. to Suppress at 2 (arguing the Brannon affidavit "is not worthy of belief" and that it is "flawed evidence consistent with the defendant's other attempts to generate evidence to support her false claims").  It does not suggest why a Federal Defender in Florida would take that risk for a defendant now represented by other counsel and facing charges in Maine.  Its argument also implicitly suggests that DeLaurentiis's neighbor committed perjury in his affidavit, again without any apparent reason for the neighbor to take that risk.  <u>See</u> <u>id</u>.

[11] I recognize that the DEA agents documented three instances in this same conspiracy where they stopped questioning a target/defendant upon invocation of the right to counsel, <u>see</u> Post Arrest Statement of Brent Noyes (Gov't Ex. 3); Post Arrest Statement of Daniel Littlefield (Gov't Ex. 4); Post Arrest Statement of Nancy Squeglia (Gov't Ex. 4), and one instance (undocumented at the hearing) where the testifying agent stated that a request and clarification/withdrawal were memorialized.  I could speculate, but I do not know, why (as I have found) the agents operated differently here.

     I also recognize that in the government's rebuttal case, the prosecutor asked the testifying agent the leading question, "Were there times during the interview that you had a difficult time understanding what she was saying?" and the agent responded "Absolutely."  But rather than this question and answer leading to the possibility of agent confusion about DeLaurentiis's invocation of her right to counsel, the agent proceeded to testify that DeLaurentiis "never" asked for an attorney, that she did not ask for her uncle, and that her allegations of what she said to the agents were "completely false."  If the agents had agreed that they heard DeLaurentiis refer to her uncle during questioning, and explained that they interpreted the reference or request as ambiguous and explained why, or if they had testified that they could not understand her and had asked her to repeat herself, but she refused to do so, such explanations might have produced a different outcome on the motion.  But here the agents deny altogether that DeLaurentiis and they said the things that she recounted to her uncle in the credible, emotional jailhouse phone call immediately after the interview.  It is not enough for the government to get one statement from one agent that sometimes DeLaurentiis was difficult to understand, then argue in its reply brief that any request for an attorney must have occurred during some such incoherent statement.  <u>See</u> Gov't's Post-Hr'g Supplemental Arg. on Def.'s Mot. to Suppress at 3.

threats to "tell the judge" if DeLaurentiis did not cooperate were coercive and that her resulting statements were involuntary.[12]

Accordingly, the motion to suppress is **GRANTED**.

**SO ORDERED.**

**DATED THIS 25TH DAY OF JUNE, 2009**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[12] See United States v. Ramirez, 112 F.3d 849, 853 (7th Cir. 1997) (noting that by "telling the suspect that if he refuses to talk to them his lack of cooperation will be reported to the prosecutor," the police "would nullify or at least undermine" the Miranda warnings); United States v. Harrison, 34 F.3d 886, 891-92 (9th Cir. 1994) (stating that "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor" (emphasis in original)); United States v. Melnikas, 929 F. Supp. 276, 281 (S.D. Ohio 1996) ("Threatening to inform the court or a prosecutor of a suspect's refusal to cooperate in order to elicit such cooperation violates an individual's Fifth Amendment right to remain silent and is clearly coercive."); Recommended Decision on Def. Littlefield's Mot. to Suppress at 10-11, United States v. Littlefield, No. 07-74-B-H-04 (D. Me. Nov. 7, 2008) (noting that "[t]he distinction between a representation that a defendant may benefit from cooperation and a representation that he may suffer for failing to cooperate is one that our jurisprudence attaches significant meaning to").